The Law Office of Kissinger N. Sibanda, PLLC
1802 Vernon St NW PMB 558, DC 20009
Email: ksibanda@temple.edu
Website: https://kissingersibanda.wixsite.com/kensibanda

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SLYVESTER N. OTIJI,

           *Plaintiff,*

    -against-

UNIVERSITY OF THE DISTRICT OF
COLUMBIA - WDLL, MAJEEDA AL-JABBAR,
MERYLIN LEVY-CRUZ, MASHONDA SMITH,
ELLEN JEFFERSON, KATHERINE BRUCE,
ALEX BEKO.

           *Defendants.*

1-24-Civ –

Related matter: 1:23-cv-00380 (JMC)

## COMPLAINT

1. Federal
   TITLE VII: 42 U.S. Code, Title 42 §
   2000e-1(a), *et seq.*
   a.   Retaliation
   b.   Hostile work Environment
   c.   Discrimination
   d.   Lack of Accommodation
2. DC HUMAN RIGHTS ACT
   D.C. Code § §§ 2-1401.01  (a). *et seq…*
   a. Discrimination
   b. Retaliation
   c.   Hostile work environment
3. Age Discrimination in Employment Act
   (ADEA) 42 U.S.C. Sections 6101-6107.
4. Americans with Disabilities Act
   42 U.S. Code § 12101
5. Intentional Infliction of Emotional
   Distress

## JURY TRIAL DEMANDED

Plaintiff, DR. SLYVESTER N. OTIJI, through their attorney Dr. Kissinger N. Sibanda, against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action seeking monetary and equitable relief based upon Defendants' of following: based on discrimination and retaliation for filing discrimination complaints; under Title VII, 42 U.S. Code, Title 42 § 2000e-1(a) ); under District of Columbia Human Rights Act (DCHRA); and under Negligent Infliction of Emotional Distress tort.

2.      The conduct complained of in this action involves Defendants' coercion, retaliation, and interference with Plaintiff's exercise of his work duties, unwarranted suspensions, bullying and creation of adverse work environment. Defendants interfered with plaintiff's job applications as detailed in this complaint, making sure to sabotage any job advancement.

3.      Plaintiff alleges that he was discriminated against based on <u>national origin, race,</u> (African) and <u>age</u> in comparison to her fellow co-workers. Plaintiff further states that he always was qualified for his position, capable and able to do his job. A huge part of the discrimination complaint is because plaintiff is an African, a naturalized American.

4.       The retaliatory conduct following his protected activity includes, but is not limited to, the issuance of adverse performance ratings and evaluations, loss of overtime and other per session opportunities, as well as disciplinary letters to file.

5.      In sum, Plaintiff alleges that his employer, UDC-WDLL, AND ALL DEFENDANTS, engaged in suspensions in retaliation for her, internal and discrimination, complaints, both internal and external, violating her employment rights.

*All defendants are sued in both their official and unofficial capacity\*.*

## EXHAUSTION OF ADMININISTRATIVE REMEDIES

6.  Dr. Otiji exhausted all administrative barriers, regarding filings with The Equal Employment Commission, before fling the instant matter, by filing actions with the various employment bodies – prefiling actions. Firstly, he filed an EEOC complaint, and then he filed a human rights complaint with the District of Columbia. Exhibit: <u>1</u> and <u>2</u>.

7.  DC Office of Human Rights (DCHR) granted a right to sue on August 20th, 2024. Exhibit: <u>3</u>. Stating:

    OHR has administratively dismissed this matter without making a determination on the merits. Accordingly, for claims under the D.C. Human Rights Act, Complainant may file a private cause of action in the D.C. Superior Court. D.C. Code § 2-1403.16(a). The D.C. Human Rights Act allows claims to be filed within one (1) year from the incidents in question. D.C. Code § 2-1403.04(a). "The timely filing of a complaint with the office shall toll the running of the statute of limitations while the complaint is pending." D.C. Code § 2-1403.16(a).                    Exhibit: <u>3</u>.

8.  DCHR did not state any determination on the merits, as this was an administrative dismissal. *Id*.

9.  EEOC's right to sue was also granted a right to sue on <u>August 26, 2024</u>. (Exhibit: <u>1</u>)

10. Plaintiff timely filed a notice of claim against defendants UDC, with the DC government, which was rejected as unnecessary. Exhibit: <u>4</u>.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as this matter involves federal questions.

12. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

13. This action's venue properly lies in the United States District Court for District of Columbia, pursuant to 28 U.S.C. § 1391, because a substantial part of the acts or omissions giving

rise to this action occurred in this District and Defendants are subject to personal jurisdiction in this District.

14.     Supplemental claims are proper because they are authorized under D.C. Superior Court. D.C. Code § 2-1403.16(a) and occur under the same cause of action.

## PARTIES

1.  Plaintiff avers that defendants are: UDC WDLL, Ms. Majeeda Al-Jabbar (IT Pathway Director), Merylin Levy-Cruz (Associate Dean of WDLL), Dr. Mashonda Smith (Dean, WDLL), Ms. Ellen Jefferson (UDC OHR), Ms. Katherine Bruce (UDC OHR), Mr. Alex Beko (UDC Vice President, Risk Assessment).

2.     Plaintiff Sylvester Otiji is a resident of District of Columbia and the State of District of Columbia. Plaintiff is currently residing in District of Columbia and employed by UDC WDLL. He is a naturalized American citizen above the age of 40.

3.     University of District Columbia WDLL, herein, UDC WDLL, is a public University in the District of Columbia.

4.     At all times relevant herein, Defendant Ms. Majeeda Al-Jabbar worked at UDC WDLL.

5.     At all times relevant herein, Defendant, Ms. Ellen Jefferson worked at UDC WDLL

6.     At all times relevant herein, Defendant Ms. Katherine Bruce was plaintiff's supervisor at UDC WDLL.

7.     At all times relevant herein, Defendant Ms. Majeeda Al-Jabbar worked at UDC WDLL.

8.     At all times relevant herein, Defendant Ms. ALEX BIKO worked at UDC WDLL.

9.     Defendants are equally and jointly liable to plaintiff for their liability and damage.

## STATEMENT OF FACTS

First Person Narrative From Dr. Sylvester N. Otiji[1]

10. Incidents of Inappropriate, Illegal and Discriminatory Actions taken in retaliation against Sylvester N. Otiji by University of District of Columbia, Workforce Development and Lifelong Learning (UDC-WDLL) staff, for filing an EEOC complaint against UDC-WDLL on July 2021 and December 12, 2023.

**PIRATING MY WORKPLACE COMPUTER (7/2/21 – present day):**

11. Mr. Maurice Green and Mr. Brandon Russell of UDC-WDLL were caught pirating and manipulating the contents of my workplace computer on multiple occasions, with the acquiescence of supervisors in UDC-WDLL (Majeeda Al-Jabbar, Mashonda Smith and Ms. Levy-Cruz). These pirating and unauthorized actions included:

12. Secretly mirroring my office computer to monitor my correspondence without informing me.

13. Took my picture without my consent, in my office, using a concealed camera.

14. Replaced my office computer in my absence to access my EEOC complaint and other personal files, and photos, and removed the flash drive in the USB port of my computer, which contained pictures of my family.

15. My personal AOL email account was hacked and mirrored by these individuals several times after I filed an EEOC complaint against UDC-WDLL.

16. Ms. Al-Jabbar sent me an invalid link to apply for clearance with the DC Office of the Chancellor, so that I could participate in teaching an Apple course at a local elementary

---

[1] Editing Dr. Otiji's first person narrative chills the advocacy in regard to "statement of facts."

school.  I have yet to receive a response from the Chancellor's office, and Ms. Al-Jabbar's has indicated that she wishes to teach the class herself, with her friend, Ms. Renee Woodfin, even though neither of them has any IT subject knowledge.

17. Because of these actions, I feel stressed, apprehensive, and worried about my safety every day that I enter the workplace.

### SECRETLY RECORDING MEETING/CONVERSATION IN MY OFFICE
### (Jan 12, 2023):

18. Ms. Al-Jabbar came to my office and asked me to turn on MS Teams to join her in a meeting with Mr. Maurice Green to discuss purchasing a hard drive. I joined the meeting already in progress. During the meeting. Ms. Al-Jabbar suggested that Mr. Green physically come to my Office. We were still in the meeting on MS Teams, and Mr. Green came over while Ms. Al-Jabbar remained on the call from her office, while we continued the discussion. Later that day, I received an email, allegedly sent from me (I did not send it) to me, with the recording and transcript of the meeting in the email.  Ms. Al-Jabbar came into my office at the end of the day, stating that "someone had recorded our meeting" and implying that I was the one who had recorded it.  I advised her that I had not made such a recording of the meeting and noted that it is against UDC policy to record a meeting without the consent of those participating.  It was very apparent that the meeting had been recorded by Mr. Green when he was standing, in person, in my office, using a personal recording device, and that through misuse of computer access, the message was sent by someone else from my email.  The intent of all this by my supervisor was to blame me for making an unauthorized meeting recording. This incident was further expanded when Ms. Levy-Cruz sent an email on Jan 27, 2023, stating that she was awaiting direction from Human Resources on how

to handle the unauthorized recording that I had allegedly made. The incident shows how far the WDLL will go to falsely frame me of inappropriate behavior and attempt to force me out of WDLL.

### CREATING A HOSTILE WORK ENVIRONMENT:

19. Ms. Al-Jabbar, Ms. Levy-Cruz, and Dean Smith have made repeated efforts to alienate me against other WDLL employees, by circulating rumors about my EEOC complaint (which I never spoke to anyone in the office about), telling people that I will be leaving soon or will be forced to resign. Some employees have openly confronted me by email or in person, asking me why I can't respect Ms. Al-Jabbar. (See Ms. Renica Robinson email. Exhibit #2)

20. 3.B. Dean Smith, Ms. Al-Jabbar, and Mr. Stewart Donaldson repeatedly disparaged me to those working on the Apple HBCU-C2 Apple Program at Tennessee State University (TSU). Specifically, Dr. Blackman of TSU should be interviewed to confirm that inappropriate and negative comments were made to this group.

21. 3.C. Even though my personal office is routinely locked (and I am not provided a key, it must be opened by the security officer), I arrived at work on October 19, 2022, to a foul odor in my office. I discovered that someone had urinated in my office desk drawers. I had to seek the office janitor to help me clean and sanitize my office. No explanation was provided to me by my supervisor as to how someone could access my office when it was always locked by the security officer.

22. 3.D. On May 16, 2022, Ms. Kathrin Bruce, UDC Employee Relations Manager, falsely announced to everyone that I had COVID. As a result, I was told I could only return to the office once I tested negative for COVID. At the time, everyone was afraid of the COVID-19 pandemic, and only served to further isolate and disengage me from my

WDLL colleagues. On July 15, 2022, she sent me an unsolicited Confidential Medical Note, advising me to apply for Family Medical Leave, stating, "Dr. Otiji, if you are going to be missing work due to your medical condition, I suggest you contact me to apply for family medical leave for yourself." This unsolicited guidance was inappropriate, since over the last three years, I have rarely taken sick leave and currently have a substantial sick leave balance.  It would seem such a conversation would be merited if the employee made the inquiry, as well if the employee was running out of sick leave.  I found this interaction with Ms. Bruce to be harassment and intimidating as a way to encourage me to leave my position at UDC-WDLL.

23. On July 20, 2022, Ms. Madeline Levy-Cruz, the Associate Dean of WDLL, met with me in what she explained to me was a casual meeting, to discuss her commitment to improvement. The discussion was very informal according to her. Here are some of the significant points she made to me:

24. She expressed surprise that my office was very small and could barely accommodate my wheelchair.

25. She talked to me at length about her family and her personal life, and relocating to UDC to take her new job, reinforcing her statement that this was an 'informal' meeting.

26. She stated that I should reach out to her whenever I have any issue that needs to be addressed. She said, "For example, in the email, you wrote to Ms. Al-Jabbar about non-IT staff advising IT Prospective students, that Ms. Al-Jabbar, and Mr. Asante had no IT education nor training" that I should have talked to her (Ms. Levy- Cruz).  I explained that the email was within the scope of my job description and responsibilities. She then requested if I could forward her my job description, which surprised me, since

as the Associate Dean, she should have already been aware of my job description.  I did forward it to her.

27. Ms. Cruz stated her puzzlement, which she was still investigating, as to why my position in WDLL needed to be reflected in the WDLL organizational chart that was given to her by her supervisor when she was hired as Associate Dean of WDLL.

28. She stated that I should approach her for recommendations if I desire to leave the WDLL. I had not raised the topic of potentially leaving WDLL, only she raised it.

29. She stated that some IT decisions are made at "higherup" and that she would prefer it if I did not make any professional comments about IT decisions. I asked if she would like it to not be consulted on something that was her job and assigned duties, but she did not provide any clear response to my question. The meeting ended amicably. She never, at any time, told me that this 45-minute meeting was considered as "counseling", as she had presented it as an informal conversation.

30. The same evening, I received an email from Ms. Levy-Cruz entitled "Memorandum of Counseling." I was surprised by this memo, which attempted to summarize most (but not all) of the things we had discussed, including how I  persistently spoke to WDLL staff about my EEOC complaint (I had never raised it to anyone in the office), and requesting a copy of my job description.  She went on to state in the memo that my efforts to raise questions and address issues was unwelcome, and that "This kind of questioning of processes outside the scope of your duties…makes it difficult for the very important work that we do at the WDLL…" It was perplexing to receive such criticism about the scope of my duties, since she had never actually seen my job

description. In addition, she stated that my communications with Ms. Al-Jabbar "were unnecessarily adversarial and…causing a breach in effective productivity and hindering the work of the team."   Since the overwhelming majority of my communications were only directly with Ms. Al-Jabbar and were restricted to written communication, it was hard to understand how such communications could impact 'productivity and the work of the team.'  Ms. Levy-Cruz demanded in the memorandum that I respond to her issues raised in the memo within two days. I was shocked and surprised to the tone of the memorandum. In any case, I responded. (see Exhibit # 3)

31. Since I filed an EEOC Complaint on 4/27/2020, I have been constantly harassed, rebuked, and worked on under a hostile environment for performing my job. This specific incident with Ms. Levy-Cruz aligns with how others treat me, hoping I will resign from my job and leave UDC-WDLL.

32. **HACKING INTO AND OVERRIDING HOURS RECORDED IN TIMEKEEPING ACCOUNT:** On several occasions, Ms. Al-Jabbar has hacked into my timekeeping account to change my time and attendance, despite the fact that she has been warned several different times by HR not to do this.  HR advised that I am a manager and that she has no business trying to enter or modify my hours worked. She insisted that she was just trying to ensure I was being honest with my timekeeping.  Ms. Al-Jabbar has said openly many times that she "does not trust foreigners." (see Exhibit #4)

33. Ms. Akia Avery (HR, UDC), appointed to supervise Ms. Al-Jabbar's behavior toward me, met with me and reassured me that my timecard was always filled out the right way. I informed her that I requested the District of Columbia District Attorney's Office to investigate Ms. Al-Jabbar's unlawful act, but she discouraged my request. Ms. Al-

Jabbar created a hostile environment for me, while UDC allowed her to act unethically, without any repercussions. (See Exhibit #5)

**REMOVING ME AS THE PROGRAM MANAGER FOR THE APPLE HBCU-C2 PROJECT (August 2022):**

34. Dean Smith asked me to forward all the Apple HBCU-C2 files I had in my possession to her because she decided to remove me as the program manager. I forwarded the files to her and she then assigned the project to Ms. Al-Jabbar (who does not have a college degree and has almost no technical

35. knowledge of computers, software or the Apple program). The same evening, Ms. Al-Jabbar called me and asked if I had any secret way to have access to the files for Tennessee State University's (TSU) HBCU-C2 Hub. Ms. Al-Jabbar told me I should not try to log in to the TSU site anymore. She explained that I was no longer representing UDC-WDLL.  No explanation of my removal from the program was ever provided to me by Dean Smith or Ms. Al-Jabbar.  Ms. Al-Jabbar then deleted all my Apple credentials (of which I had many) posted on the Apple HBCU-C2 Ambassador Program MS Team Platform. She also asked the Office of Information to confiscate my Apple ID. When my Apple ID was confiscated, my 23 Apple Teacher Certifications were, in turn, deleted. Again, no reason was given as to why these actions were taken.

36. **HIRING OF UNQUALIFIED IT INSTRUCTORS:** It is my responsibility to recruit and select qualified IT instructors.  When I inquired of Ms. Al-Jabbar about the information technology courses being offered at the Greenleaf Center, I was advised that WDLL no longer offered training at that center. I later learned that Ms. Al-Jabbar's friend, Ms. Renee Woodfin, was teaching at the Greenleaf Center, even though she did not have the proper credentials to teach any IT class, and that Ms. Woodfin was never

interviewed for the position. Ms. Al-Jabbar simply appointed her to the job, even though Ms. Al-Jabbar has no computer technology knowledge or skills.

### REASSIGNMENT OF MY OFFICIAL JOB DUTIES:

37. **EXAMPLE 1**(January 19, 2023): I was asked by Dean Smith and Ms. Al-Jabbar to create a course outlined to teach 5th graders an Apple course at a local elementary school. I designed a standard course outline to be used by a certified, experienced teacher to deliver the course to the students. Ms. Al-Jabbar then requested that I create step-by-step instructions on teaching the class, as she had decided to teach the class herself. I objected to this plan, as Ms. Al-Jabbar does not have a formal education, does not understand IT subject matter, and has no teaching experience.

38. **EXAMPLE 2:** (November 2, 2022): at the Territorium "Career Bit" meeting with a contractor (Julie Murphy) as well as Stuart Donaldson, Ms. Al-Jabbar angrily interjected as I spoke and announced to those present that I was not an expert to be discussing the alignment and path for how information technology coursework aligns with job skills. She stated that WDLL had hired someone else to replace me in aligning IT courses with the job market. A follow-up meeting was scheduled on November 14th, which included Dean Smith, at which time Dean Smith confirmed Ms. Al-Jabbar's earlier announcement that aligning IT courses with the job-market had been assigned to a new employee, who possessed less education and experience in the IT field than I have. Ms. Al-Jabbar's and the Dean's actions were preplanned and part of a concerted effort to chip away at my job functions, discourage me, and push me to resign from my position with UDC-WDLL.

39. **EXAMPLE 3:** Dean Smith met with Ms. Akia Avery (HR, UDC) and subsequently cancelled all upcoming scheduled meetings between herself and me without any explanation.  This sent the message to me that I was no longer valued in WDLL.  Later, in a general staff meeting, Dean Smith stated that she had taken over the supervision of IT adjunct instructors and would evaluate them herself.  This was originally part of my job description, and no reason or rationale was every given as to why this responsibility was being removed from me.

40. **EXAMPLE 4:** I was advised that the duty of working with employers on information technology needs and recruitment was removed from my responsibilities. The task was then assigned to Ms. Dennavier Battle in WDLL, and I was asked to teach her how to perform the duties.

41. **EXAMPLE 5:** Additional duties that were removed from my assigned job description:

42. IT training orientation and advising for prospective IT students was reassigned to Ms. Al-Jabbar and Mr. Shakuur Asante.  Both have no training or technical knowledge of IT skills and IT industry experience.

43.

44. Classroom functions and observation responsibilities were removed as my responsibility by Dean Smith, who stated that she would take over these duties.  Dean Smith has no IT training, knowledge or teaching experience in this field.

45.

46. Operations and management of the IT training program was reassigned to Ms. Al-Jabbar, who has no experience in this area.  In fact, Ms. Al-Jabbar acknowledged to me once that she possessed no training or experience in the field of information technology.

47. The continuous removal of these key components of my job description and duties has been demoralizing and disheartening to me as I attempt to continue to perform my remaining duties at UDC WDLL.

**UNQUALIFIED INDIVIDUALS MANAGING THE APPLE HBCU-C2 PROGRAM AND INAPPROPRIATE USE OF STIPEND FUNDS (September 2022):**

48. During an HBCU-C2 virtual meeting, it was announced that Ms. Al-Jabbar had been assigned to manage the Apple HBCU-C2 initiative, and that funds budgeted for stipends to pay two program managers (of which I was one) would instead be used to pay two UDC staff (Brandon Russell and Maurice Green. When I inquired why the stipend funds were being used to pay UDC employees instead of those working as program managers (including me), I was told by Ms. Levy-Cruz that the decision was made higher up. Those present in this meeting were Ms. M. Cruz (AD), Ms. Al-Jabbar, Mr. Brandon Russell, Mr. Maurice Green, and Mr. Noel Tevin (TSU).

**IMPOSITION OF SUPERVISED MEETINGS BY HR**

49. (September 7, 2021): After attempting to discuss my EEOC complaint with Ms. Akia Avery, Esq. of UDC's HR department, Ms. Avery advised me that I must never call, write to, or have any discussion with Ms. Al-Jabbar without a witness (Ms. Avery) present, and that she (Ms. Avery) must be included in any meeting scheduled with Ms.

Al-Jabbar. This requirement continued for over one year, until Ms. Avery was promoted to a new position, at which time Ms. Kathrin Bruce replaced her and continued with this aggressive monitoring.  I originally inquired if I was allowed to have my lawyer present at meetings as well, but this request was denied. I was advised in May 2022 by HR that the requirement to have a witness at our meetings/correspondence was a mistake, a misunderstanding, and that they would cease, which they eventually did after more than one year. At no time did anyone explain why HR had determined that all interactions between Ms. Al-Jabbar and myself must be 'supervised' by a UDC lawyer.  This situation made me feel cautious, paranoid and treated inequitably and unfairly by UDC.

50. All these actions are reflective of how WDLL has treated me since I filed an EEOC discrimination complaint in April 2020. UDC-WDLL has continually perpetuated a hostile work environment for me, causing me great discomfort and anguish.  These incidents, coupled with WDLL's unwillingness and intransigence to allow me to do my job and use my extensive expertise in information technology, has taken a toll on my mental and physical health.

**SECRETLY RECORDING MEETING/CONVERSATION IN MY OFFICE (Jan**

First Person Narrative from Dr. Sylvester Otiji *

**D. Retaliation:**

51. **Failure to Provide Reasonable Accommodation**: Despite my request under the Americans with Disabilities Act (ADA), I was denied reasonable accommodation after

being assigned physically demanding tasks such as cleaning classrooms and lifting heavy boxes of old computers. These duties exacerbated my pre-existing back and spinal conditions, yet my request for accommodations was ignored, violating ADA guidelines. (UDC OHR). **First request: 6/10/2024    Second request: 11/1/2024**

52. **Punishment for Performance Review Comments**: I was reprimanded and penalized for merely providing comments on my annual performance review, which did not accurately reflect my actual contributions. My feedback, intended to correct discrepancies, was instead met with disciplinary action. (UDC OHR, Dr. M. Smith, AD Merylin                                                                                                      Cruz)

    **Date:                                                                                                    2023–2024)**

53. **Reduction in Job Responsibilities Due to Whistle blowing**: After I reported that funds were being improperly allocated from the Workforce Development and Lifelong Learning (WDLL) budget to an adjunct instructor assigned to teach classes she was not qualified to teach during the summer of 2023, my responsibilities were significantly reduced. This retribution was carried out under the direction of Ms. Majeeda Al-Jabbar and Mr. Donaldson Stuart. (Dr. M. Smith, AD M. Cruz, and Mr. Stuart Donaldson)

    **Date:                                                                                                    10/22/2024**

54. **Isolation and Punishment for Refusing Unethical Contract Approvals**: Ms. Al-Jabbar authorized two contracts totaling over $40,000 for work in the IT Lab and attempted to coerce me into endorsing these contracts. Upon my refusal, I was stripped

of my duties and reassigned to the Office of Information Technology, effectively isolating me from my previous colleagues. I was also labeled as a "traitor," which further led to my social isolation within the organization. (Ms. Majeeda Al-Jabbar, AD M.                                                                                                    Cruz) **(Ongoing–2024)**

55. **I was frequently asked to recommend purchasing of tools and appliances that are not perishables**. When I question about the previous ones purchased I was punished. **(Ongoing–2024).**

56. **Forced Retraining in an Area of Expertise**: I was coerced into undergoing retraining for the use of Blackboard Ultra, a system in which I have over 15 years of experience and for which I have already been certified twice while at UDC WDLL. This action was intended to undermine my qualifications and expertise. **(Ongoing–2024)**

57. **Encouragement to Resign**: During a conversation, my supervisor (AD) verbally advised me to consider finding employment elsewhere and resigning from my current position. She even shared that she had done the same at her previous job in Delaware in 2022. This statement was made to pressure me into leaving voluntarily. **(Ongoing 2024)**

58. **Humiliation during Retraining**: I was forced to undergo retraining for a function that was never part of my job role. During this process, the links provided to other trainees

were deliberately disabled for me, which appeared to be an attempt to publicly shame me and imply incompetence. (Ms. AD Merylin Cruz) **(Ongoing–2024)**

59. **Denial of Access to Essential Equipment**: All the equipment I recommended for the Apple Technician Training program, including laptops, iPhones, and iPads, was deliberately hidden from me. The justification given was that I "could not be trusted" with the equipment, despite my position as the IT Program Coordinator. This action severely hindered my ability to fulfill my job responsibilities. (Ms. Majeeda Al-Jabbar and AD Merylin Cruz) **(Ongoing–2024)**

60. **Blame for Class Failures Due to Favoritism**: Despite being the IT Program Coordinator, decisions regarding the assignment of classes were made based on favoritism rather than the qualifications of staff members. Non-IT staffs were assigning classes, resulting in poor student outcomes. Despite my lack of control over these decisions, I was blamed and punished for the low pass rates of the students. (Ms. Majeeda Al-Jabbar) **(Ongoing-2024)**

61. **Denied pay increases and bonuses:** for not performing a good job even when I am the only IT professional in my department of three staffs who performed the bulk of technical IT function**. (Ongoing–2024)**

62. **I have been written up about two times for performing my function:** by pointing out that IT function were being assigned to non-IT personnel's. (AD M. Cruz, and Ms.

Majeeda                          Al-Jabbar)                          **(Ongoing–2024)**

63. **Hired New IT Coordinator:** I was informed in 8/2024 that a new IT Coordinator has been hired to replace me, and she is located at the Dean's Office. This was done to force me to resign my position. (AD M. Cruz). **(Ongoing–2024)**

64. **Corrupt Performance evaluation Form:** I was provided with a corrupted and improperly configured performance evaluation form to complete, along with an unreasonably tight deadline. Despite the challenges, I managed to complete the form but was unable to save it. Additionally, certain sections of the form were interconnected, causing any text entered in one section to automatically duplicate in other areas. This is done so that I will miss the deadline which was not clearly stated. **(Currently: 11-15-2024)**

                                                            **End of first person insert.**

### FIRST CLAIM

*(Discrimination (national origin)* – Title VII)
*(To all defendants,)*

65. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

66. Defendants, through their conduct, have violated Title VII, by targeting Dr. Otiji for being of African origins. Their issues stem from underestimation based on his African sociology and tribalism against her Igbo tribe.

67. At all times defendants, as directed or influenced by his supervisors weaponized Dr. Otiji's national original and accent, as a sense of poor work performance.

68. At all times, Dr. Otiji received disparate treatment from non-African workers because of his race.

69. At all times she was targeted as pleaded here for frivolous dress code violations, suspensions, reduction of work and a hostile work environment.

70. Ultimately, an adverse work environment resulting in no job advancement, despite plaintiff's PhD.

**SECOND CLAIM**

(*Discrimination (gender)* – Title VII)
(*To all defendants*)

71. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein. Defendants, through their conduct, have violated Title VII, by discriminating against Plaintiff for being a female worker.

72. Defendants treated plaintiff differently from other co-workers, because he is a male, as evidenced by write-ups and attacks on his work ethic. Similar situated females were not treated like plaintiff.

73. At all times defendants did not treat females with the same disdain, and ridicule plaintiff was treated.

74. Ultimately, an adverse work environment resulting in no job advancement, despite plaintiff's PhD.

**THIRD CLAIM**
(*Hostile Work Environment* - Title VII )
(*To all defendants*))

75. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

76. Defendants created a hostile work environment by targeting plaintiff for imagined poor work ethic, and attacks on his general work performance.

77. At all times defendants chose to treat plaintiff disparate from their "in" group, she was an outsider marked for hostile and retaliatory action.

78. The hostile work environment was evidenced by failure to adhere to internal email and suspension policies.

79. Defendants' actions were directly responsible for the resulting hostile work environment, requiring plaintiff to take therapy.

80. Ultimately, an adverse work environment resulting in no job advancement, despite plaintiff's PhD.

### THIRD CLAIM
(*Lack of Accommodation* -Title VII)
(*To all defendants*)

81. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

82. Defendants failed to make reasonable accommodations consistent with plaintiff's requests.

83. Plaintiff asked defendants if he could work from him in November 2024; and 2022, they refused.

84. Defendants ignored this request for accommodation, *work from home*, consistent with plaintiff's diagnoses. Exhibit: 5.

85. At all times defendants chose to treat plaintiff disparate from their "in" group, he was an outsider marked for hostile and retaliatory action, due to disability.

86. The hostile work environment was evidenced by failure to adhere to internal email and suspension policies.

87. Defendants' actions were directly responsible for the resulting hostile work environment, requiring plaintiff to take therapy.

88. Ultimately, an adverse work environment resulting in no job advancement, despite plaintiff's PhD.

**FOURTH CLAIM**
Americans with Disabilities Act
42 U.S. Code § 12101

89. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

90. Defendants created a hostile work environment by failing to accommodate plaintiff's disability.

91. At all times defendants chose to treat plaintiff disparate from their "in" group, he was an outsider marked for hostile and retaliatory action, due to disability.

92. The hostile work environment was evidenced by failure to adhere to internal email and suspension policies.

93. Defendants' actions were directly responsible for the resulting hostile work environment, requiring plaintiff to take therapy.

94. Ultimately, an adverse work environment resulting in no job advancement, despite plaintiff's PhD.

**FIFTH CLAIM**
(DISTRICT OF COLUMBIA STATE HUMAN RIGHTS LAW, DCHRA)

DCHRA §§ 2-1401.01, *et seq*
*Race and National Origin*
*(To all defendants)*

95. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

96. Defendants, through their conduct and discrimination, have violated District of Columbia State Human Rights Law (DCHRA) by discrimination and retaliating, against him because he is of African/Nigerian origin.

97. Defendants discriminated by treating plaintiff disparate from other works; as shown in frivolous suspensions, attack on his work ethic and Nigerian origins.

98. Defendants went to a great effort to block equal work treatment, resulting in plaintiff's *de facto* demotion.

99. Plaintiff suffered damages, not limited to emotional pain and suffering for the direct discrimination (disparate treatment), resulting in loss of equal work, responding to frivolous suspensions and demeaning work emails, as detailed here.

100. Ultimately, an adverse work environment resulting in no job advancement, despite plaintiff's PhD.

**SIXTH CLAIM**
(DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, DCHRA)
DCHRA, §§ 2-1401.01, et seq
*Retaliation*
*(To all defendants)*

101. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

102. ("[T]he probable cause standard . . . requires consideration of whether [Complainant's] version of events [are] reasonable, not whether he failed to disprove

[Respondent's] version of events."); *Grove v. Loomis Sayles & Co.*, 85 A.3d 832, 836 (D.C. 2014)

103.    The District of Columbia Human Rights Act ("DCHRA") provides that "it shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having [either] exercised or enjoyed or . . . aided or encouraged any other person in the exercise or enjoyment of any right granted or protected" under this Act. D.C. Code § 2-1402.61(a).

104.    Courts generally look to retaliation case law under Title VII for guidance in deciding retaliation cases under the DCHRA. *Howard Univ. v. Green*, 652 A.2d 41, 45 (1994). Moreover, an employer violates the anti-retaliation provisions if it takes an adverse action that is "motivated in substantial part by retaliatory reasons, even if [the employer] was motivated also by legitimate business reasons." *Propp v. Counterpart Int'l*, 39 A.3d 856, 870 (D.C. 2012).

105.    Defendants, through their conduct and discrimination, have violated District of Columbia State Human Rights Act (DCHRA) by discrimination and retaliating, against him as a man of Nigerian origin; and for filing discrimination employment complaints both internally and externally.

106.    Defendants retaliated at plaintiff engaging in protected activity (complaining against work discrimination).

107.    Plaintiff suffered damages, not limited to emotional pain and suffering for the discrimination, resulting in retaliation.

108.    Defendants by blocking plaintiff's employment opportunities *caused* him

emotional pain and suffering.

109.    Ultimately, an adverse work environment resulting in no job advancement,

despite plaintiff's PhD.

## SEVENTH CLAIM
### Negligent Infliction of Emotional Distress
*(as to all defendants)*

133. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set

forth herein.

134. Defendants through their actions (unjustified punishment motivated by a policy to

discriminate against her), he suffered emotional pain and suffering.

135. Plaintiff suffered physically, at having to endure reputational damage to his hard-won

career, through attacks against his accent, national origin, accent and frivolous suspensions.

136. Defendants should have known that their actions would result in emotional and reputational

harm by bringing false suspensions against plaintiff. Consequently, their inactions, or actions

were a *but for*, cause or direct cause of plaintiff's deteriorating emotional state and stress, at that

time. Defendants caused a measurable and irreparable harm resulting from false suspensions.

137. Defendants by blocking plaintiff's employment opportunities causes emotional pain and

suffering.

138. Plaintiff had to receive psychiatrist treatment to deal with defendants' actions. As

documented here.

139. Ultimately, an adverse work environment resulting in no job advancement, despite

plaintiff's PhD.

## NINTH CLAIM

Age Discrimination in Employment Act (ADEA)
42 U.S.C. Sections 6101-6107
*(To all defendants)*

140. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

141.  Plaintiff is above 40 years old.

142. Plaintiff was deliberately targeted for abusive and demeaning behavior because of his age.

143. The younger employees, less than 40 years, did not receive such behavior.

144. Due to defendants' actions, plaintiff suffered and endured a hostile environment and adverse work environment resulting in no job advancement, despite plaintiff's PhD.

**JURY DEMAND**

145. Plaintiff demands a trial by jury on all the triable issues in this complaint.

**PRAYER FOR RELIEF**

146. WHEREFORE, Plaintiff prays for declaratory relief and damages as follows:

A.  A declaratory judgment that Defendants violated Title VII, regarding the above claims.

B.  A declaratory judgment that Defendants violated the DCHRA.

C.  Awarding Plaintiff compensatory damages (including but not limited to emotional distress damages and damages accruing because of numerous lost employment opportunities) and punitive damages (to the extent available) pursuant to the various statutes.

D.  Awarding Plaintiff costs; and reasonable attorney fees.

E.  *Such other and further relief* as this Court may deem just and proper.

Dated:      Washington, DC
            NOVEMBER 22, 2024,

                                                                By:    /s/

Signature

Dr. Kissinger N. Sibanda Esq
*Plaintiff's attorney*